1

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    DEXTER Y. WILKINS,                    CASE NO. CV F 07-00621 LJO WMW HC

12                    Petitioner,           **ORDER DENYING PETITION FOR WRIT**
                                            **OF HABEAS CORPUS WITH**
13          vs.                             **PREJUDICE; DIRECTING CLERK OF**
                                            **COURT TO ENTER JUDGMENT FOR**
14    CHRIS STRICKLAND,                     **RESPONDENT; DECLINING ISSUANCE**
                                            **OF CERTIFICATE OF APPEALABILITY**
15                    Respondent.
16    _____/

17
          On April 24, 2007, Dexter Y. Wilkins ("Petitioner"), a *pro se* California prisoner, filed a Petition
18
for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition").[1]  On
19
May 8, 2008, Chris Strickland ("Respondent") filed an Answer to the Petition.  On June 10, 2008,
20
Petitioner filed a Traverse.  Thus, this matter is ready for decision.
21
                                   **PROCEDURAL HISTORY**
22
          On May 10, 2004, a Kern County Superior Court jury convicted Petitioner of rape of a drugged
23
victim (Count Three, Cal. Penal Code § 261(a)(3)) and rape of a victim unconscious of the nature of the
24
act (Count Four, *id.* § 261(a)(4)).  (Clerk's Tr. ("CT") 320, 322, 445.)  On July 1, 2004, the superior
25
court sentenced Petitioner to eight years each on Counts Three and Four in state prison, but stayed the
26

27  _____

28          [1]         Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302,
the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

1

1  sentence in Count Four.  (*Id.* 441-42, 445.)

2       On July 1, 2004, Petitioner appealed his conviction and sentence to the California Court of

3  Appeal.  (CT 450-51.)  The court of appeal affirmed the judgment in a reasoned opinion on November

4  16, 2005, as amended.  (Lodged Doc. ("LD") 4.)  On December 19, 2005, Petitioner filed a petition for

5  review in the California Supreme Court, which summarily denied the petition on January 25, 2006.  (LD

6  6-7.)  On March 14, 2007, Petitioner filed a habeas petition in the California Supreme Court, which

7  summarily denied the petition on September 25, 2007.  (LD 8.)  On April 24, 2007, Petitioner filed the

8  instant federal Petition.

9                        **FACTUAL BACKGROUND**[2]

10      *Prosecution Case*

11         Pearl A. moved into her parent's residence in Bakersfield in 2002.[3] She met [Petitioner] in February 2003[4] when [Petitioner] came to her residence to clean the carpets. On Valentine's Day [Petitioner] left Pearl[5] a small present and note, and at some

12  point thereafter he called her and asked her if she wanted "[to] just go hang out for a little while." Pearl accepted. At the time, she was 21 years old.

13         On March 4, [Petitioner] picked up Pearl at her residence and took her to a pool hall, where the two played pool and drank some beer. Later, [Petitioner] drove Pearl

14  around Bakersfield, giving her a tour of the town. Pearl had with her a bottle of vodka that [Petitioner] had left with her a few days previously and which she intended to return

15  to him. [Petitioner] stopped at a store, bought some cranberry juice and mixed Pearl a drink with the juice and vodka. Pearl drank it in the car.

16         At some point thereafter, [Petitioner] stopped the car at a motel, the Garden Suites Inn; told Pearl it was "a friend's place"; and asked her if she wanted to go in. Pearl

17  had to use the bathroom, so she went with him into a room she described as "like, a one-bedroom apartment."

18         Inside the apartment, Pearl used the bathroom, after which she and [Petitioner] sat on the couch and watched television, and Pearl drank another

19  cranberry-juice-and-vodka drink. She fell asleep while watching television.

20         At some point [Petitioner] awakened Pearl. Pearl felt "a little nauseous, like [she] had too much to drink." Her boots, which she was wearing when she fell asleep, were

21  off. At the time she thought she must have kicked them off. Later, after [Petitioner] took

22   

23        [2]     The Court adopts the factual background from the November 16, 2005, California Court of Appeal opinion, as amended, on direct review as a fair and accurate summary of the evidence presented at trial.  *See* 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002).

24   

25        [3]     [California Court of Appeal footnote 1:] Except as otherwise indicated, the "Prosecution Case" portion of the factual statement is taken from Pearl A.'s testimony.

26        [4]     [California Court of Appeal footnote 2:] Except as otherwise indicated, further references to dates of events are to dates in 2003.

27   

28        [5]     [California Court of Appeal footnote 3:] For the sake of brevity, and not out of disrespect, we refer to Pearl A. by her first name.

her home, she noticed her belt was not fastened "all the way," contrary to the way she "always" fastened her belt.

At no time during the evening did she have consensual sex with [Petitioner]. Counts 3 and 4 were based on events at the Garden Suites Inn during the time frame set forth above.

[Petitioner] called Pearl the next day, and the two went out again later that week, to the pool hall where they had gone previously. Subsequently, they went out a third time, to a movie.

On March 15, Pearl and [Petitioner] went out together a fourth time. [Petitioner] picked up Pearl at her home and took her to a restaurant, where he introduced her to a group of his friends, including Kevin Elijah, who were in the bar area. [Petitioner] and Pearl sat at a table in the bar area. She asked [Petitioner] to order her a drink and she went to the restroom. When she returned there was vodka and cranberry juice on the table. She drank it and "a little bit" of a second drink. At that point, she felt "sick" and "dizzy." Pearl did not remember having anything else to drink, but she was "sure" that she had. After drinking some of the second drink, Pearl went to the restroom a second time, where she vomited. [Petitioner] did not go in the restroom with Pearl, and she did not have sex with [Petitioner] in the restroom.

She left the restroom and went back to her table. After that, Pearl did not remember anything except waking up and realizing someone was carrying her "[o]ver the shoulder," at which point she "passed out."

A bartender at the restaurant testified to the following. On the night of March 15 a woman "got up from the bar and was stumbling to get to the bathroom ...." The woman went in the restroom alone. After "a few minutes" a waitress went into the bathroom to check on the woman. The waitress came out "a couple minutes" later and reported that the woman was "passed out." [Petitioner] went into the women's restroom and "[t]wo to three minutes" later, came back out, carrying the woman over his shoulder.

Kevin Elijah testified to the following. [Petitioner] carried Pearl over his shoulder out of the restaurant. It appeared Pearl was intoxicated. Elijah and [Petitioner] placed Pearl in the back seat of Elijah's car, [Petitioner] got in the car and Elijah drove to his (Elijah's) apartment. Pearl was unconscious in the back seat. When they arrived at the apartment, the three went inside. Pearl was able to walk, and did so. She lay down on the floor in the living room. Elijah went to the "back room" of the apartment, and left Pearl in the living room with [Petitioner]. She was fully dressed at the time. Elijah came back out five to ten minutes later and saw [Petitioner] and Pearl, who were both naked, having sex on the floor in the living room. Elijah "thought [he] heard moaning from both persons." He "[s]tepped back to [his] room." Approximately five to ten minutes later, [Petitioner] asked Elijah for a ride home. Elijah left the apartment with [Petitioner] and drove him home; Pearl was unconscious and naked on the living room floor when Elijah left. He assumed Pearl would ask him for a ride home when she woke up.

Elijah further testified to the following. When he returned to his apartment after taking [Petitioner] home he found Pearl on the floor as he had left her. Elijah went to his bedroom and went to bed. At some point thereafter, Pearl woke him by calling to him from the hallway, addressing him as "Dexter" and asking him for a ride home. Elijah responded that he was not Dexter and that he would give her a ride home. However, Elijah then "rolled over and went back to sleep," and he did not take Pearl home. He did not have sex with Pearl.

Pearl testified that the next thing she remembered after being carried out of the restaurant was waking up in Elijah's apartment, naked, with a blanket wrapped around her. Feeling nauseous, she went to the bathroom. She saw a used condom in the toilet. She came back out to the living room. Her clothes were scattered around the living room "[a]nd there was a guy on the floor." Thinking the man was [Petitioner], she addressed him as Dexter, but the man said he was not Dexter. Pearl recognized him as Elijah, whom she had met earlier at the restaurant. Pearl put on her shirt, pants and shoes, and asked Elijah where she was. Elijah told her, and Pearl called her father. Shortly thereafter

3

her father arrived and took her home.

Pearl had no memory of having sex with anyone from the time [Petitioner] picked her up until the time she arrived back home. Counts 1 and 2 were based on events occurring within this time frame. When Pearl got back home she vomited. Her mother took her to the hospital.

Thelisa Stoy, a nurse at the hospital where Pearl was taken, testified that she performed a pregnancy test on Pearl, the results of the test were positive and it was "possible" Pearl was impregnated on March 4 or March 5. Pearl testified [Petitioner] was the only man she "had been out with" since moving to Bakersfield. On November 12, Pearl gave birth to a baby boy. The prosecution presented chemical evidence that the probability that [Petitioner] was the father was 99.98 percent.

Bill Posey testified to the following. He is a toxicologist. He analyzed a portion of a urine sample Pearl gave at the hospital on March 16, and found it contained the equivalent of .08 percent blood alcohol content. He opined that Pearl's blood alcohol level would have been approximately .25 percent at 10:00 p.m. on March 15, and that a person of Pearl's weight would have to consume approximately "six to seven mixed drinks or cans of regular beer or glasses of wine" to reach that blood alcohol level. The sample also contained a "small amount" of gamma hydroxyl butyrate, commonly known as GHB. GHB occurs naturally in the human body. It is "possible" Pearl consumed no GHB on March 15. The amount of GHB in Pearl's body was "a little bit over what most people would consider to be normal."

Los Angeles Police Department Detective Bryce Spafford testified to the following. GHB is a central nervous system depressant. A "light dose" would result in drowsiness and a lowering of inhibitions. A "higher dose" could produce nausea, vomiting, further lowering of inhibitions and loss of consciousness. The drug "wears off really quickly," and a person who has ingested it can wake up and "not remember ... what happened the last few hours beforehand." Alcohol "really intensifies" the effect of GHB.

*Defense Case.*[6]

[Petitioner] cleaned the carpets in Pearl's apartment in November 2002, but he first met her the following February when he was working at the apartment directly across from hers. He and Pearl went out together for the first time on March 4. He picked her up at approximately 9:30 p.m., and after they "drove around for a little while" Pearl "brought ... out" a bottle of vodka he had given her previously.

[Petitioner] drove to a store and bought cups and ice. He then drove Pearl around Bakersfield, giving her a tour, and as he drove Pearl "prepared the drinks" for the two of them. After Pearl and [Petitioner] drank one "21-ounce size cup," they went to a pool hall where they played pool and "had a few beers." At approximately 11:45 p.m. [Petitioner] asked Pearl if she "like[d] Jacuzzis," she said she did and [Petitioner] drove to the Garden Suites Inn where [Petitioner] rented a room with a Jacuzzi. [Petitioner] filled the Jacuzzi, and he and Pearl got in. Pearl mixed drinks and they drank some of these drinks while in the Jacuzzi. They stayed in for approximately 20 to 30 minutes. When they got out they "had consensual sex," after which Pearl fell asleep. Pearl did not appear intoxicated, and [Petitioner] did not give her GHB. [Petitioner] took Pearl home at approximately 2:00 a.m.

On March 15 [Petitioner] took Pearl to a restaurant where [Petitioner] had arranged that that [sic] he and Pearl would get together with a group of his friends. At the restaurant Pearl drank at least five mixed drinks. After they had been at the restaurant approximately one hour, Pearl "[a]sked [Petitioner] to the bathroom." [Petitioner] went into the women's bathroom with Pearl, and the two "had sex inside of the stall" for approximately 10 minutes, after which they "went back to the bar, continued with the group drinking."

At some point thereafter, Pearl, who appeared to be "very intoxicated" and was

---

6   [California Court of Appeal footnote 4:] The defense case portion of the factual statement is taken from [Petitioner]'s testimony.

not walking well, asked [Petitioner] to "to take her to the bathroom ...." [Petitioner] walked with her to the bathroom and went inside with her, where she vomited. [Petitioner] called for help, someone came and [Petitioner] "attempted to walk out with her." Pearl, however, was "staggering," so [Petitioner] "put her over [his] shoulder" and carried her out of the restaurant. At some point thereafter, Elijah helped place Pearl in the back seat of his car. [Petitioner] did not put GBH [sic] in any of Pearl's drinks.

[Petitioner] placed a telephone call to Pearl's home and left a message, and Pearl's sister returned the call. [Petitioner] told her Pearl was "drunk" and "passed out." Pearl's sister said "[t]his happens all the time," and asked if she should wake her father.[7] [Petitioner] thought that was a "bad idea" and he and Elijah decided to take Pearl to Elijah's apartment. When they arrived, [Petitioner], Elijah and Pearl went into the apartment. Pearl was able to walk. Inside the apartment, Pearl was "dry heaving." [Petitioner] was "concerned" about Pearl, but after 10 to 15 minutes he left her in the living room with Elijah. There was no furniture in the room and Pearl was lying on the floor, fully clothed. [Petitioner] "had to be home at a certain time" because he did not want his wife to know he was with a woman and he wanted to be home before his wife arrived.

(LD 4 at 2-8.)

## PETITIONER'S CLAIMS

1.   The trial court improperly excluded evidence of the victim's alleged petty theft and alleged lie about the petty theft (Pet. 5);

2.   The trial court imposed the upper term sentence on Counts 3 and 4 based on unconstitutional judicial fact-finding by a preponderance of the evidence (*id.*); and

3.   Ineffective assistance of trial and/or appellate counsel to the extent Claims One and Two are defaulted (*id.* 6).

## STANDARD OF REVIEW

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2)  resulted in a decision that was based on an unreasonable determination of the

---

7      [California Court of Appeal footnote 5:]  Pearl's sister testified that she spoke with [Petitioner] by telephone but that she did not say that her sister frequently became intoxicated.

1    facts in light of the evidence presented in the State court proceeding.

2    28 U.S.C. § 2254(d).

3    Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of

4    state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the

5    time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine

6    what, if any, "clearly established" United States Supreme Court law exists, the court may examine

7    decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669

8    n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598

9    (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an

10   unreasonable application of, clearly established federal law if no Supreme Court precedent creates

11   clearly established federal law relating to the legal issue the habeas petitioner raised in state court.

12   *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 127 S. Ct.

13   649, 654 (2006).

14   A state court decision is "contrary to" clearly established federal law if the decision either applies

15   a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result

16   the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8

17   (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is

18   contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by

19   § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of

20   the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court

21   decision contradicts them." *Early*, 537 U.S. at 8.

22   State court decisions which are not "contrary to" Supreme Court law may only be set aside on

23   federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly

24   established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S.

25   at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the

26   governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case.

27   *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam).

28   However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show

6

1   that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537

2   U.S. at 24-25, 27.  An "unreasonable application" is different from an "erroneous" or "incorrect" one.

3   *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, __ S. Ct. __, No. 07-772, 2009 WL

4   129033, at *8 (Jan. 21, 2009); *Woodford*, 537 U.S. at 25.

5         A state court factual determination must be presumed correct unless rebutted by clear and

6   convincing evidence.  28 U.S.C. § 2254(e)(1).  Furthermore, a state court's interpretation of state law,

7   including one announced on direct appeal of the challenged conviction, binds a federal court sitting in

8   habeas corpus.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

9                                    **DISCUSSION**

10                                    **Claim One**

11        In his first claim, Petitioner contends that the trial court violated his constitutional rights because

12  it excluded evidence relating to an alleged petty theft committed and lied about by the victim.  (Pet. 5.)

13  Respondent argues that this claim is procedurally defaulted and alternatively argues that the claim has

14  no merit.  (Answer 11-20.)  Because the California Supreme Court summarily denied this claim (*see* LD

15  8), the Court must "look through" to the last reasoned decision, that of the California Court of Appeal

16  on direct review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).  The court of appeal rejected

17  Petitioner's claim on procedural grounds and alternatively on the merits.  (*See* LD 4 at 15.)

18                                Procedural Default

19        With regard to the procedural ground, the court of appeal stated:

20            Finally, [Petitioner] argues that excluding the proffered evidence violated his
        "right to confront and cross-examine [Pearl] and his right to present a defense in
21      violation of federal constitutional rights under the Sixth and Fourteenth Amendments."
            However, although [Petitioner] argued below that the admission of the proffered
22      evidence was not barred by section 352, he did not argue that excluding the evidence
        would violate his constitutional rights. Therefore, he may not raise such claims on
23      appeal. (*People v. Sanders* (1995) 12 Cal.4th 783c, 510, fn. 3; *People v. Sapp* (2003) 31
        Cal.4th 240, 275.)
24
    (LD 4 at 15.)
25
26        A federal court will not review claims in a habeas petition if the state court has denied relief on

    a state law ground that is independent of the federal question and adequate to support the judgment.
27
    *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The "independent and adequate state ground
28

                                              7

doctrine" is grounded in concerns of comity and federalism. *Id.* at 730-32. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989) (internal quotation marks omitted).

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001) (*citing Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)). "A state law ground is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (*quoting Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)). For a state procedural rule to be "adequate" to support the judgment, "the state's legal grounds for its decision must be firmly established and consistently applied." *King v. LaMarque*, 464 F.3d 963, 965 (9th Cir. 2006). To be firmly established and consistently applied, the rule must be clear and certain. *King*, 464 F.3d at 965-966.

In ascertaining whether a state procedural bar is independent and adequate, the Ninth Circuit has implemented a burden-shifting framework:

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state[].

*Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003); *see also King*, 464 F.3d 963, 966-67.

Here, the California Court of Appeal denied Petitioner's claim by finding Petitioner failed to argue at trial that the exclusion of evidence was a constitutional violation, and that this therefore precluded Petitioner from raising the constitutional claim on appeal. (LD 4 at 15; *see* 2 Rep.'s Tr. ("RT") 111-20 (transcript of trial court's ruling).) The court of appeal alternatively held that Petitioner's claim was without merit. (LD 4 at 15); *see infra* Claim One, Merits Review. If a state court decision rests on independent state grounds, it does not lose the default even if it alternatively considers the merits of the federal question as well. *Harris*, 489 U.S. at 264 n.10; *Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992).

The procedural bar imposed by the court of appeal is California's "contemporaneous objection rule":

> Under Section 353 of California's Evidence Code, also known as the "contemporaneous objection rule," evidence is admissible unless there is an objection, the grounds for the objection are clearly expressed, and the objection is made at the time the evidence is introduced. California courts construe broadly the sufficiency of objections that preserve appellate review, focusing on whether the trial court had a reasonable opportunity to rule on the merits of the objection before the evidence was introduced.

*Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002) (footnote omitted); *see, e.g.*, *People v. Scott*, 21 Cal. 3d 284, 290 (1978) ("In a criminal case, the objection will be deemed preserved if, despite inadequate phrasing, the record shows that the court understood the issue presented.").

California's contemporaneous objection rule is applied independently of federal law. *See Vansickel v. White*, 166 F.3d 953, 957 (9th Cir. 1999) (recognizing and applying California's contemporaneous objection rule in affirming denial of a federal petition on the ground of procedural default); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995) (sustaining state court's finding of procedural default where defendant failed to make any objection at trial). Additionally, California courts have consistently applied the contemporaneous objection rule. *Melendez*, 288 F.3d at 1125 (*citing Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981)); *Vansickel*, 166 F.3d at 957; *Bonin*, 59 F.3d at 842-43.

Respondent adequately pled the existence of an independent and adequate state procedural bar, that of California's contemporaneous objection rule on direct appeal for Petitioner's failure to object to the exclusion of evidence at trial on constitutional grounds. (*See* Answer 11-14); *Bennett*, 322 F.3d at 586.[8] The burden to place the procedural default defense in issue therefore shifts to Petitioner. *Bennett*, 322 F.3d at 586. However, Petitioner has failed to offer any explanation for the inadequacy of California's contemporaneous objection rule as applied to his case. (*See* Traverse.)

Accordingly, Petitioner's claim is procedurally defaulted, *see Bennett*, 322 F.3d at 586, and the

---

[8] Although Petitioner objected at trial to the exclusion of evidence under California state law, Petitioner failed to object based on a violation of federal constitutional rights. (*See* 2 RT 111-20.) This was sufficient to preclude Petitioner from raising the constitutional issue on direct appeal pursuant to California's contemporaneous objection rule. (*See* LD 4 at 15); *see also, e.g.*, *Renteria v. Subia*, No. EDCV 07-776 JVS (AN), 2008 WL 2413998, at *5 n.6 (C.D. Cal. June 13, 2008); *Jaiceris v. Fairman*, 290 F. Supp. 2d 1069, 1077-78 (N.D. Cal. 2003).

1    Court cannot afford relief unless Petitioner "can demonstrate cause for the default and actual prejudice

2    as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will

3    result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Cook v. Schriro*, 538 F.3d

4    1000, 1025 (9th Cir. 2008).

5                        Cause and Prejudice or a Fundamental Miscarriage of Justice

6            In order to establish cause for a procedural default, a petitioner must "show that some objective

7    factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."

8    *Coleman*, 501 U.S. at 753 (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  The Supreme Court

9    has not adopted a precise definition of what constitutes "cause."  *See Edwards v. Carpenter*, 529 U.S.

10   446, 451 (2000).  The Supreme Court has, however, identified at least three instances that may constitute

11   cause: 1) the factual or legal basis for a claim was not reasonably available to the petitioner; 2) some

12   interference by state officials made the petitioner's compliance with the state procedural rule

13   impracticable; and 3) the default was the result of ineffective assistance of counsel.  *See Murray*, 477

14   U.S. at 488-89.  To establish prejudice, the petitioner bears the burden of establishing that the error at

15   trial "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of

16   constitutional dimensions."  *Id.* at 494 (*quoting United States v. Frady*, 456 U.S. 152, 170 (1982)).

17           Lastly, a federal habeas court may also excuse a petitioner's procedural default where a

18   fundamental miscarriage of justice would result.  *See Murray*, 477 U.S. at 495-96.  To establish a

19   fundamental miscarriage of justice, a petitioner must show that "a constitutional violation has probably

20   resulted in the conviction of one who is actually innocent."  *Id.* at 496.  "[P]risoners asserting innocence

21   as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not

22   that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *House v. Bell*,

23   547 U.S. 518, 536-37 (2006) (*quoting Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

24           Petitioner attempts to bypass the procedural default by arguing ineffectiveness of trial counsel

25   in this third claim for relief.  (*See* Pet. 6.)  Petitioner states that his trial counsel failed to cite the federal

26   constitution in arguing for the admission of the victim's alleged petty theft and lie.  (*See id.*)  In order

27   for attorney error to constitute "cause" to excuse a procedural default, it must rise to the level of a

28   constitutional violation of the right to counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

*Coleman*, 501 U.S. at 752; *Murray*, 477 U.S. at 488.  In addition, where the "cause" for procedural default is ineffectiveness of counsel, the underlying ineffectiveness claim must have been exhausted in state court.  *Murray*, 477 U.S. at 488-89.  Here, Petitioner exhausted his ineffectiveness of trial counsel claim in the California Supreme Court on habeas review, which denied the claim without comment.  (*See* LD 8 at 43-45; LD 8 Op.)[9]

For a petitioner to prevail on an ineffective assistance of counsel claim, he must show: (1) that counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687.  A court evaluating an ineffective assistance of counsel claim does not need to address both components of the test if the petitioner cannot sufficiently prove one of them.  *Id.* at 697; *Thomas v. Borg*, 159 F.3d 1147, 1151-52 (9th Cir. 1998).

To prove deficient performance, a petitioner must show that counsel's representation fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 687-88.  Because of the difficulty in evaluating counsel's performance, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  Only if counsel's acts or omissions, examined in light of all the surrounding circumstances, fell outside this "wide range" of professionally competent assistance will the petitioner prove deficient performance.  *Id.* at 690; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  The petitioner must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

Establishing counsel's deficient performance does not warrant setting aside the judgment if the error had no effect on the judgment.  *Id.* at 691; *Seidel v. Merkle*, 146 F.3d 750, 757 (9th Cir. 1998).  A petitioner must show prejudice such that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.  *Strickland*, 466 U.S. at 694.  Thus, the petitioner will only prevail if he can prove that counsel's errors resulted in a "proceeding [that] was

---

[9] The California Supreme Court on habeas review denied Petitioner's ineffective assistance of counsel claim without citation.  (*See* LD 8.)  Although it may be unclear whether Petitioner's ineffective assistance claim, used as "cause" to excuse procedural default, is reviewed under the deferential 28 U.S.C. § 2254(d)(1) standard or reviewed de novo, *see, e.g.*, *Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003) (acknowledging but not answering the question), the Court finds that under any standard of review Petitioner fails to show that his trial counsel rendered ineffective assistance.  *See infra*.

1  fundamentally unfair or unreliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

2  Petitioner does not show that he suffered prejudice as a result of trial counsel's failure to object

3  to the exclusion of evidence on constitutional grounds.  Petitioner has failed to convince the Court that,

4  had his trial counsel objected to the exclusion of evidence on constitutional grounds, there is a

5  reasonable probability that the trial court would have sustained the objection and included the evidence.

6  The trial court's finding that the exclusion of evidence was appropriate after balancing the probative

7  nature of the evidence against the possibility of prejudice, confusion of issues, and undue consumption

8  of time, likely precluded any favorable result for Petitioner had his counsel then interposed a

9  constitutional objection.  *See People v. Cudjo*, 6 Cal. 4th 585, 611 (1993) ("As a general matter, the

10 ordinary rules of evidence do not impermissibly infringe on the accused's [constitutional] right to present

11 a defense.  Courts retain . . . a traditional and intrinsic power to exercise discretion to control the

12 admission of evidence in the interests of orderly procedure and the avoidance of prejudice.") (citation

13 and internal quotation marks omitted); *see also James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (finding

14 the failure to make a futile objection or motion does not constitute ineffective assistance of counsel).

15 In addition, as to the failure to preserve the issue for appeal, notwithstanding the California Court

16 of Appeal's imposition of a procedural bar, it alternatively reached the merits of Petitioner's

17 constitutional claims and found them without merit.  (*See* LD 4 at 15.)

18 Furthermore, Petitioner does not show that his trial counsel's performance was deficient for

19 failing to object to the exclusion of evidence on constitutional grounds.  As stated by the Supreme Court:

20 > Every trial presents a myriad of possible claims. Counsel might have overlooked or
> chosen to omit [the defendant's] due process argument while pursuing other avenues of
21 > defense. We have long recognized, however, that the Constitution guarantees criminal
> defendants only a fair trial and a competent attorney. *It does not insure* [sic] *that defense*
22 > *counsel will recognize and raise every conceivable constitutional claim.*

23 *Engle v. Isaac*, 456 U.S. 107, 133-34 (1982) (emphasis added).  Moreover, because the Court finds that

24 the trial court's exclusion of evidence did not violate Petitioner's constitutional rights, *see infra* Claim

25 One, Merits Review, trial counsel's performance was not deficient for failing to object on constitutional

26 grounds.

27 Petitioner also does not show prejudice from the procedural default such that the alleged error

28 of excluding evidence at trial "worked to his *actual* and substantial disadvantage, infecting his entire trial

12

1   with error of constitutional dimensions." *Murray*, 477 U.S. at 494; *see infra* Claim One, Merits Review.

2       Finally, Petitioner does not demonstrate a fundamental miscarriage of justice by providing *new*

3   *evidence* showing it is more likely than not that no reasonable juror would have found petitioner guilty

4   beyond a reasonable doubt. *House*, 547 U.S. at 536-37; *Coleman*, 501 U.S. at 753.

5       Accordingly, Petitioner's claim that the exclusion of evidence at trial violated his constitutional

6   rights is procedurally defaulted. *Coleman*, 501 U.S. at 729.

7                                           Merits Review

8       Even assuming that Petitioner's claim is not procedurally barred, or that Petitioner established

9   cause and prejudice or a fundamental miscarriage of justice to permit federal habeas review, Petitioner

10  fails on the merits. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) (*citing Lambrix v.*

11  *Singletary*, 520 U.S. 518, 525 (1997)) (allowing merits review despite possible procedural default if

12  petitioner's claims are meritless); *see also Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982).  In

13  alternatively denying Petitioner's constitutional claims on the merits, the California Court of Appeal

14  stated:

15          And even if [Petitioner] had preserved this claim for appeal, we would nonetheless reject
            it on the merits. [Petitioner]'s constitutional claim is based, in turn, on the contention that
16          the court erroneously excluded the proffered evidence under section 352. And, as
            demonstrated above, this contention is without merit. Moreover, "'[a]s a general matter,
17          the ordinary rules of evidence do not impermissibly infringe on the accused's
            [constitutional] right to present a defense. Courts retain ... a traditional and intrinsic
18          power to exercise discretion to control the admission of evidence in the interests of
            orderly procedure and the avoidance of prejudice ....'" (*People v. Cudjo* (1993) 6 Cal.4th
19          585, 611.) The exclusion of the proffered evidence did not constitute constitutional error.

20  (LD 4 at 15.)  As stated by the court of appeal, the court relied on its analysis of the exclusion of

21  evidence under California Evidence Code section 352 in denying Petitioner's constitutional claim:

22          Prior to trial, the People filed a "MOTION IN LIMINE TO EXCLUDE
            EVIDENCE PURSUANT TO EVIDENCE CODE SECTION 352" (moving papers),
23          stating that [Petitioner] "ha[d] provided the People with discovery regarding a petty theft
            citation issued to the victim, Pearl [A.], on March 19, 2004," and seeking an order
24          "exclude[ing] any questioning of the victim regarding this petty theft incident pursuant
            to Evidence Code section 352." The People asserted in their moving papers that
25          admitting such evidence "does create undue prejudice towards the victim, does confuse
            the issues and does mislead the jury," and that "the prejudicial value of the 2004 petty
26          theft outweighs the probative effect of this evidence ...." The People also argued that
            Pearl "is now stating she did not steal the merchandise from the store," and "[t]herefore,
27          if this evidence is admitted it will necessitate calling additional witnesses for
            impeachment purposes."
28              At the hearing on the motion, the prosecutor represented to the court the

                                                13

following: Pearl and her sister "were cited for petty theft" on March 13, 2004; "they [were] alleged to have stolen a number of clothing items" from a Sears store; "offense reports ... indicated that [Pearl] admitted to [a police officer] that she had taken the clothing along with her sister"; Pearl told the prosecutor that "she [Pearl] actually didn't steal the items" but that her sister did, and that she (Pearl) told police she took the items in an attempt to "protect" her sister. The prosecutor reiterated that the "prejudicial effect" of the petty theft evidence "outweighs its probative value."

Defense counsel told the court he had "subpoenaed the people at Sears" and that reports prepared by "people at Sears" stated that "people actually witnessed [Pearl] taking items off of the shelves, taking them into the changing room, and then leaving, having placed those items in her baby carriage underneath [her] baby." Defense counsel argued that evidence of "this incident" was "very probative" of Pearl's "moral turpitude" and "her willingness to lie ...."

Initially, the court denied the prosecution's motion, ruling that the defense could present evidence of "that incident, but only in a brief fashion ...." However, moments later, after the court indicated it was under the impression that [Petitioner] had been convicted of petty theft and the prosecutor immediately clarified the case was "pending," the court reversed its ruling:

"Well, that puts a different swing on this thing.... I was under the impression that ... she had been convicted because of some admission or finding. [¶] I don't think that the fact that somebody has a charge pending for a petty theft is an appropriate means of questioning that individual's credibility on another issue, so I guess my ruling would be to ... not allow this witness to be questioned regarding the involvement in the alleged petty theft which hasn't been resolved."

Defense counsel responded that evidence that Pearl admitted to police that she committed the theft but denied she had done so when she spoke to the prosecutor "would seem to be probative as a prior inconsistent statement." In response, the prosecutor argued that the "prior inconsistent statement" was "on a completely distinct and separate issue from the issues in the trial ...."

At that point, defense counsel reiterated his argument that evidence Pearl herself removed items from shelves taken in conjunction with evidence of her statement to the prosecutor that she did not steal anything and only told police otherwise in order to protect her sister, indicated "an ability to lie to cover up her own fault – her own wrongdoing."

The court responded, "I'm not going to allow that. That's too far – ... [¶] ... – afield ...."

. . . .

[Petitioner] challenges the court's exclusion of the evidence that (1) Pearl committed theft and thereby engaged in conduct evincing moral turpitude, and (2) Pearl lied to the prosecutor when she denied committing theft, thereby "showing an ability to lie to cover up her own wrongdoing." Evidence Code section 352 provides, in relevant part, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice ...." [footnote omitted] [Petitioner] first argues that the record fails to demonstrate that the court engaged in the weighing process required by section 352, i.e., the process of weighing the probative value of the proffered evidence against the danger that the admission of that evidence would result in undue consumption of time and/or prejudice. This argument is based, in turn on the following premises: (1) theft involves moral turpitude (*People v. Wheeler* (1992) 4 Cal.4th 284, 297); (2) misconduct involving moral turpitude, regardless of whether it constitutes a felony or results in criminal conviction, may suggest a willingness to lie, and thus, is admissible to impeach a witness in a criminal trial, subject to section 352 (*id.* at pp. 295-296); and (3) in the instant case the court mistakenly believed that the fact that Pearl had not suffered a *conviction* of petty theft rendered the proffered evidence inadmissible, ruled the evidence inadmissible on that basis and

14

therefore failed to engage in the weighing process required by section 352.

As the People do not dispute, the first two of these premises is correct. (*People v. Wheeler*, *supra*, 4 Cal.4th at pp. 295-296). The third is not.

""""[O]n a motion invoking [Evidence Code section 352] the record must affirmatively show that the trial judge did in fact weigh prejudice against probative value ...."" (*People v. Clair* (1992) 2 Cal.4th 629, 660.) "But the court need make no express statements on these issues so long as the record affirmatively shows that weighing occurred, and there is an adequate basis for appellate review." (*People v. Arias* (1996) 13 Cal.4th 92, 155.) In *People* v. *Padilla* (1995) 11 Cal.4th 891, 924, our Supreme Court stated: "[A]s the cases reflect, we are willing to infer an implicit weighing by the trial court on the basis of record indications well short of an express statement. Several of the cases to which we have been cited involved argument of counsel or comments by the trial court, or both, touching on the issues of prejudice and probative value from which we might infer that the court was aware of the Evidence Code section 352 issue and thus of its duty to weigh probative value against prejudice. [Citations.]"

Applying these principles to the case before it, the *Padilla* court held: "The prosecution stated in its pretrial brief that an Evidence Code section 352 weighing was required as a condition of admitting the evidence and, although not the strongest of reeds, defense counsel in his oral argument on the point took the position that what he referred to as the 'extreme prejudice' likely to follow on the admission of such evidence should bar its use. This use of the talismanic word 'prejudice,' together with the prosecution's discussion of the weighing process in its pretrial brief on the point, are a sufficient assurance ... to signal that counsel and the trial court had in mind the appropriate analytic framework for passing on the admissibility of the evidence, that the court was therefore aware of the need to weigh the evidence under section 352, and thus that it must have done so." (*People v. Padilla*, *supra*, 11 Cal.4th at p. 924.)

Similarly, in the instant case the prosecutor, in his moving papers and in oral argument, specifically referred to the process of weighing the probative value of the proffered evidence against its potential prejudicial effect. And in his moving papers the prosecutor, in arguing that additional witnesses would be necessary, suggested that the admission of the evidence would necessitate an undue consumption of time. Defense counsel, for his part, made specific reference to the probative value of the evidence.

[Petitioner] focuses on the court's remarks, and suggests that we must draw the inference that from the court's references to the fact that charges were "pending," the court misunderstood the law and believed that the absence of a conviction precluded admissibility. We disagree. The record does not compel this conclusion. It is at least as plausible, from the court's initial willingness to admit the evidence "in a brief fashion," followed by its change of course when it realized [Petitioner] had not suffered a conviction, that the court had accepted the prosecution's implicit argument that the admission of the proffered evidence would have resulted in an undue consumption of time. And the court's reference to the evidence being "far ... afield" also suggests the court was considering the probative value of the evidence. On this record, [Petitioner] has not met his burden of establishing the court failed to engage in the required weighing process. (*People v. Alvarez* (1996) 49 Cal.App.4th 679, 694 ["burden is on an appellant to affirmatively show in the record that error was committed by the trial court"].)

[Petitioner] next argues that assuming the court engaged in the required weighing process, the court abused its discretion in excluding the proffered evidence. This contention too is without merit.

The trial court's exercise of discretion in admitting evidence under section 352 will not be disturbed on appeal "'*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124; accord *People v. Tran* (1996) 47 Cal.App.4th 759, 771 ["'[a] trial court's exercise of discretion under Evidence Code section 352 will not be reversed unless it 'exceeds the bounds of reason, all of the circumstances being considered'"] .)

We first consider the probative value of the excluded evidence. "Probative value goes to the weight of the evidence .... The evidence is probative if it is material, relevant, and necessary." (*People v. Thompson* (1980) 27 Cal.3d 303, 318, fn. 20.) "'[H]ow much "probative value" proffered evidence has depends upon'" three factors: (1) "'the extent to which it tends to prove an issue by logic and reasonable inference (degree of relevancy),'" (2) "'the importance of the issue to the case (degree of materiality),'" and (3) "'the necessity of proving the issue by means of this particular piece of evidence (degree of necessity).'" (*Ibid.*)

There is no dispute the proffered evidence was relevant. (§ 210 [evidence is relevant if it has "any tendency in reason to prove ... any disputed fact"].) As indicated above, misconduct involving moral turpitude may suggest a willingness to lie, and is therefore relevant on the issue of a witness's credibility (*People v.* Wheeler, *supra*, 4 Cal.4th at pp. 295-296) and theft is a crime indicating both moral turpitude and dishonesty (*id.* at p. 297).

Militating in favor of admissibility is the fact that the alleged theft occurred less than two months prior to trial. (*People v. Clair*, *supra*, 2 Cal.4th at p. 654 [when considering the admissibility of such evidence under section 352, the trial court should consider, inter alia, whether the offense is "near in time"]; cf. *People v. Wheeler*, *supra*, 4 Cal.4th at p. 297 ["relatively recent" conviction of misdemeanor grand theft, "an offense necessarily involving both moral turpitude and dishonesty, was highly relevant to [witness's] credibility"].) On the other hand, "[i]n general, a misdemeanor—or any other conduct not amounting to a felony–is a less forceful indicator of immoral character or dishonesty than is a felony." (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 296.) Moreover, whether Pearl committed a theft or lied to the prosecutor were collateral matters, i.e., matters which, though relevant on the issue of Pearl's credibility, "had nothing to do with the facts at issue in the trial." (*People v. Lavergne* (1971) 4 Cal.3d 735, 742.) And "[w]hile collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value ...." (*Ibid.*)

Materiality considerations militate more strongly in favor of admissibility. As [Petitioner] points out, Pearl was the sole complaining witness and her testimony directly contradicted that of [Petitioner] on the crucial issue of whether she and [Petitioner] engaged in consensual sex. Further, [Petitioner]'s acquittal on the charges arising out of the events of March 15 indicate the jury was not prepared to accept Pearl's account of events in all respects. Thus, the issue of her credibility was of great "importance ... to the case." (*People v. Thompson*, *supra*, 27 Cal.3d at p. 318, fn. 20.)

On the question of the necessity of using the proffered evidence to prove Pearl was not a credible witness, we note, as defense counsel argued in closing, that other evidence, in addition to [Petitioner]'s testimony, supported the inference that Pearl did not testify truthfully.[10]

We turn now to the prejudice side of the balance. Section 352 "empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 296.) "[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id.* at pp. 296-297.) In the instant case, the potential for undue consumption of time was apparent. The court reasonably could have concluded that

---

10    [California Court of Appeal footnote 7:] [Petitioner] cites instances which, he argues, raise "credibility questions with [Pearl's] testimony ...." For example, he notes, Pearl testified that she felt sick upon waking up in the room in Garden Suites Inn on the night she first went out with [Petitioner] and that she felt sick the next day when [Petitioner] telephoned her, but City of Bakersfield Police Detective Steven Bratcher testified Pearl told him on March 16 she did not "get sick" the first occasion she went out with [Petitioner].

16

admitting the proffered evidence would have resulted in a time-consuming trial within a trial on the question of whether Pearl committed a theft.

The foregoing demonstrates that before the trial court were various factors, some of which militated in favor of admission of the evidence and some against. Applicable here is the following statement by our Supreme Court in *People v. Clair*, *supra*, 2 Cal.4th at page 655 upholding a trial court's exclusion of evidence under section 352: "Surely, another court might have concluded otherwise. That fact, however, reveals nothing more than that a reasonable difference of opinion was possible. Certainly, it does not establish that the court here 'exceed[ed] the bounds of reason ....'" The court's conclusion that the proffered evidence was inadmissible under section 352 was not an abuse of discretion.

(LD 4 at 8-15.)

Petitioner claims that the exclusion of evidence that would impeach the victim's testimony violated his constitutional rights to confrontation, presentation of a defense, and a fair trial. (Pet. 5.) The Court addresses each claim in turn.

### Right to Confront and Cross-Examine Witnesses

The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has explained that the right of confrontation "means more than being allowed to confront the witness physically," but rather "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (internal quotation marks and citation omitted); *Slovik v. Yates*, 545 F.3d 1181, 1186 (9th Cir. 2008). The Confrontation Clause does not prevent a trial judge from imposing "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Slovik*, 545 F.3d at 1186.

Nevertheless, the Supreme Court has held that a defendant's Confrontation Clause rights have been violated when he is "prohibited from engaging in otherwise *appropriate* cross-examination . . . and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall*, 475 U.S. at 680 (*quoting Davis*, 415 U.S. at 318) (emphasis added). Accordingly, the defendant has met his burden when he has shown that "[a] reasonable jury might have received a significantly different impression of [a witness'] credibility had . . . counsel been permitted to pursue his proposed line of cross-examination." *Id.*

1    Review of the limitation on cross-examination is conducted on each witness separately.  *See*

2    *United States v. Larson*, 495 F.3d 1094, 1103 (9th Cir. 2007) (*citing Van Arsdall*, 475 U.S. at 680).  In

3    addition, Confrontation Clause errors are subject to harmless-error analysis.  *Winzer v. Hall*, 494 F.3d

4    1192, 1201 (9th Cir. 2007).  Errors are harmless if they do not have a "substantial and injurious effect

5    or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see*

6    *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007); *Winzer*, 494 F.3d at 1201.

7    The Court finds that the trial court imposed "reasonable limits" on the victim's cross-

8    examination that did not run afoul of the Confrontation Clause.  As stated by the court of appeal, alleged

9    evidence that the victim committed a prior petty theft would have only been marginally relevant because

10   it involved an 1) unadjudicated, 2) collateral matter, which 3) the victim disputed.  (*See* 2 RT 111-20;

11   1 CT 254-55); *Wise v. Bowersox*, 136 F.3d 1197, 1205 (8th Cir. 1998) (finding party has no right to

12   impeach a witness' credibility with evidence of unrelated arrests); *United States v. Farid*, 733 F.2d 1318,

13   1320 (8th Cir. 1984) (stating evidence of a pending charge is not proper subject for impeachment).

14   In addition, evidence of the victim's alleged petty theft and lying would have been time

15   consuming and confusing to introduce at trial.  At the trial hearing, Petitioner stated he subpoenaed

16   witnesses from the store at which the victim allegedly shoplifted in an effort to show that the victim stole

17   merchandise.  (2 RT 115-16.)  Although the victim stated to police that she stole the merchandise, the

18   victim stated to the prosecution that she admitted stealing the merchandise in order to protect her sister,

19   who was with the victim at the time of the incident.  (*Id.* 111.)  Petitioner sought to show that the victim

20   lied to the prosecution about protecting her sister by providing evidence that the victim did in fact steal

21   the merchandise.  (*Id.* 115-17.)  The victim's alleged lie to the prosecution would require Petitioner to

22   at least call the prosecutor and/or the victim to the stand.  All of this indicates Petitioner's intention to

23   litigate the petty theft charge and associated events to the fullest extent, likely requiring the prosecution

24   to call its own witnesses in an attempt to refute the theft charge and leading to a time consuming mini-

25   trial.

26   The introduction of the alleged petty theft charge would also have created a confusing mini-trial

27   to determine if the victim 1) committed petty theft and/or 2) lied to the prosecution.  The resulting

28   confusion, undue consumption of time, and prejudice to Petitioner (if the jury chose to believe the

18

victim) indicates that the trial court acted well within its discretion by excluding evidence of a petty theft allegedly committed by the victim. *See Van Arsdall*, 475 U.S. at 679 (stating trial judge can impose "reasonable limits" on cross-examination based on prejudice, confusion of the issues, or interrogation that is marginally relevant).

Furthermore, a mini-trial unlikely would have helped Petitioner because the victim's petty theft case was pending, and the victim had not even been arraigned on those charges. (*See* 1 CT 254.) The victim would mostly likely have raised her Fifth Amendment right against self-incrimination, *see Hoffman v. United States*, 341 U.S. 479, 486-488 (1951) (stating the Fifth Amendment creates a privilege against compelled disclosures that could implicate a witness in criminal activity and thus subject him or her to criminal prosecution), something that would have frustrated Petitioner's attempt at impugning the victim's credibility. Questioning the victim would also possibly infringe upon Petitioner and the victim's constitutional rights due to, in essence, trying the victim for petty theft and trying Petitioner for rape in the same criminal proceeding.

Moreover, there is no evidence suggesting that the victim implicated Petitioner in criminal activity so as to curry favor with prosecutors or the police in the hope of receiving favorable treatment in her own criminal matters. *See United States v. Mayans*, 17 F.3d 1174, 1184 (9th Cir. 1994) ("The right to cross-examine adverse witnesses, stemming from the confrontation clause, is especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government.") (citation and internal quotation marks omitted); *United States v. Benavidez*, 664 F.2d 1255, 1262 (5th Cir. 1982) (finding trial court's refusal to allow impeachment of a witness' credibility relating to pending state charges did not violate the Confrontation Clause because no evidence existed of any deal between the government and witness to testify favorably).

Even if it was constitutional error to exclude evidence of the victim's alleged petty theft and lie, there would not have been a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. As stated, inclusion of the alleged petty theft incident and lie would necessity a confusing mini-trial whose result is uncertain, and it cannot be said that the jury's verdict would be substantially swayed. Assuming the jury could be substantially swayed, there is the possibility that Petitioner, instead of being helped by the inclusion of the victim's alleged petty theft, would have

1   been prejudiced if the jury believed the victim did not in fact steal the merchandise and/or lie to the

2   prosecution.

3         Accordingly, the Court finds that the California courts' rejection of Petitioner's Confrontation

4   Clause claim was neither contrary to, nor an unreasonable application of, clearly established federal law

5   as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

6   Right to Present a Defense & Right to a Fair Trial

7         "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a

8   complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  However, "[a] defendant's right to

9   present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as

10   evidentiary and procedural rules. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). In fact, "state and

11   federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from

12   criminal trials," *id.*, and the Supreme Court has indicated its approval of "well-established rules of

13   evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain

14   other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury," *Holmes*,

15   547 U.S. at 326.  Evidentiary rules do not violate a defendant's constitutional rights unless they

16   "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes

17   they are designed to serve." *Id.* at 324 (internal quotation marks omitted); *see also Scheffer*, 523 U.S.

18   at 315 (explaining that the exclusion of evidence pursuant to a state evidentiary rule is unconstitutional

19   only where it "significantly undermined fundamental elements of the accused's defense").  In general,

20   it has taken "unusually compelling circumstances . . . to outweigh the strong state interest in

21   administration of its trials." *Perry v. Rushen*, 713 F.2d 1447, 1452 (9th Cir. 1983).

22         Preliminarily, challenges to a state trial court's evidentiary rulings are not cognizable on federal

23   habeas review unless the admission or exclusion of evidence violated a petitioner's due process right

24   to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 70-72 (1991); *see also Spivey v. Rocha*, 194 F.3d 971,

25   977-78 (9th Cir. 1999) ("It is well settled that a state court's evidentiary ruling, even if erroneous, is

26   grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to

27   violate due process.").

28         For the same reasons that the Court denies this claim on confrontation and cross-examination

20

1  grounds, including the Court's harmless error analysis, *see supra*, the Court denies Petitioner's exclusion

2  of evidence claim on due process and fair trial grounds.

3       Accordingly, the Court finds that the California courts' rejection of Petitioner's due process and

4  fair trial claims was neither contrary to, nor an unreasonable application of, clearly established federal

5  law as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this

6  claim.

7                               **Claim Two**

8       In his second claim, Petitioner asserts that the trial judge sentenced Petitioner to the upper term

9  on Counts 3 and 4 based on judicial fact-finding in violation of his Sixth Amendment rights.  (Pet. 5.)

10  Because the California Supreme Court summarily denied this claim (*see* LD 8), the Court must "look

11  through" to the last reasoned decision, that of the California Court of Appeal on direct review.  *Ylst*, 501

12  U.S. at 803-05.  In rejecting Petitioner's claim, the court of appeal stated:

> At sentencing, the court stated it imposed upper terms on the instant offenses based on the following factors: [Petitioner] had suffered numerous prior convictions; his performance on parole and probation was unsatisfactory; and he impregnated the victim. [Petitioner] contends none of these factors was found true by a jury beyond a reasonable doubt, and therefore [Petitioner] was denied his right to trial by jury under the Sixth Amendment to the United States Constitution.
>
> [Petitioner] bases this argument on *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*) and *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*). In *Blakely* the United States Supreme Court reaffirmed the rule it announced in *Apprendi*: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Blakely, supra*, 542 U.S. at p. __ [124 S.Ct. 2531, 2536], quoting *Apprendi, supra*, 530 U.S. at p. 490.)
>
> We assume without deciding that none of the factors upon which the court based its imposition of the upper term was a "fact of a prior conviction" within the meaning of *Blakely* and *Apprendi*. (*Blakely, supra*, 542 U.S. at p. __ [124 S.Ct. at p. 2536]; *Apprendi, supra*, 530 U.S. at p. 490.) Nonetheless, [Petitioner]'s claim fails.
>
> After briefing was completed in the instant case, the California Supreme Court decided *People v. Black* (2005) 35 Cal.4th 1238. In that case, the court considered the effect of *Apprendi* and *Blakely* on California's determinate sentencing law and held that the imposition of upper terms does not constitute an increase in the penalty for a crime beyond the statutory maximum, and therefore "the judicial factfinding that occurs when a judge exercises discretion to impose an upper term sentence ... does not implicate a defendant's Sixth Amendment right to a jury trial." (*People v. Black, supra*, 35 Cal.4th at p. 1244.) Accordingly, [Petitioner]'s challenge to the imposition of the upper terms fails.

(LD 4 at 15-16.)

1     Merits Review

2          In *Blakely v. Washington*, 542 U.S. 296 (2004), the Supreme Court held that a defendant in a

3     criminal case is entitled to have a jury determine beyond a reasonable doubt any fact that increases the

4     maximum sentence, unless the fact was admitted by the defendant or was based on a prior conviction.

5     *Blakely*, 542 U.S. at 303-04.  In reaching this determination, the Supreme Court applied the rule set forth

6     earlier in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), that "[o]ther than the fact of a prior

7     conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must

8     be submitted to a jury, and proved beyond a reasonable doubt."  *Blakely*, 542 U.S. at 301.  Following

9     *Blakely*, the Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005) that the decision in

10    *Blakely* applied to the United States Sentencing Guidelines.  The Supreme Court explained that their

11    precedents "make clear that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence

12    a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the*

13    *defendant*."  *Booker*, 543 U.S. at 232 (internal quotation marks omitted).

14         Subsequently, the California Supreme Court held in *People v. Black*, 35 Cal. 4th 1238 (2005)

15    ("*Black I*"), that "the judicial factfinding that occurs when a judge exercises discretion to impose an

16    upper term sentence . . . under California law does not implicate a defendant's Sixth Amendment right

17    to a jury trial."  *Black I*, 35 Cal. 4th at 1244.  However, the United States Supreme Court in *Cunningham*

18    *v. California*, 549 U.S. 270 (2007) rejected this reasoning and held that "[i]n accord with *Blakely* . . .

19    the middle term prescribed in California's statutes, not the upper term, is the relevant statutory

20    maximum."  *Cunningham*, 549 U.S. at 288.  Facts permitting the imposition of an upper term sentence

21    must be found by the jury, not the judge.  *Id.* at 288-93.  In so finding, the United States Supreme Court

22    expressly rejected the California Supreme Court's conclusions in *Black I* that the upper term, and not

23    the middle term, qualifies as the relevant statutory maximum and that California's determinate

24    sentencing law ("DSL") "does not implicate significantly the concerns underlying the Sixth

25    Amendment's jury-trial guarantee."  *Id.* at 290-91.

26         The United States Supreme Court vacated *Black I* and remanded it to the California Supreme

27    Court for further consideration in light of *Cunningham*.  *See Black v. California*, 549 U.S. 1190 (2007).

28    In *People v. Black*, 41 Cal. 4th 799 (2007) ("*Black II*"), the California Supreme Court noted that under

the DSL (as in effect prior to the amendments the California Legislature made subsequent to *Cunningham*), "the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term [sentence]." *Black II*, 41 Cal. 4th at 813 (*citing People v. Osband*, 13 Cal. 4th 622, 728 (1996)).  The California Supreme Court held that, in situations where "one aggravating circumstance has been established in accordance with the constitutional requirements set forth in *Blakely*," the "Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances." *Id.* at 812, 813.

The Ninth Circuit has held that "*Apprendi*, *Blakely*, and *Booker* made 'courts throughout the land' aware that sentencing schemes that raise the maximum possible term based on facts not found by a jury violate the constitutional rights of defendants," and, therefore, *Cunningham* "did not announce a new rule of constitutional law and may be applied retroactively on collateral review."  *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008).  Accordingly, *Cunningham* applies to Petitioner's case, and Respondent's argument that *Cunningham* is not retroactive is without merit.  (*See* Answer 22-27.)

Here, the last reasoned state court adjudication of Petitioner's claim is the November 16, 2005, opinion of the California Court of Appeal.  (LD 4.)  In denying Petitioner's claim, the court of appeal relied on *Black I* to find that the judicial fact-finding that occurs when a judge exercises discretion to impose an upper term sentence did not implicate Petitioner's Sixth Amendment right to a jury trial.  (*Id.* at 15-16.)  Because *Cunningham* expressly rejected the reasoning in *Black I*, the court of appeal's opinion is contrary to established United States Supreme Court precedent.  *See Cunningham*, 549 U.S. at 288-93 (finding reasoning of *Black I* contrary to *Apprendi* and *Blakely*); *Butler*, 528 F.3d at 640 (finding *Black I* contrary to established federal law as it was "nowhere to be found in Supreme Court precedent").  This Court must therefore review the substantive constitutionality of Petitioner's claim de novo.  *See Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) ("The Supreme Court . . . has recently clarified our responsibility once we have found a state court error that satisfies § 2254(d)(1): When 'the requirement set forth in § 2254(d)(1) is satisfied[, a] federal court must then resolve the [constitutional] claim without the deference AEDPA otherwise requires.'" (*quoting Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007))).

1    However, the Court need not determine whether the facts found by the trial judge were

2    determined contrary to *Cunningham*, *Blakely*, and *Apprendi* because, even assuming that a constitutional

3    violation occurred, any sentencing error was harmless.

4                                        Harmless Error

5    In *Butler*, the Ninth Circuit discussed the harmless error standard of review applicable to

6    *Apprendi* violations:

> Applying *Brecht v. Abrahamson*, 507 U.S. 619 [] (1993), we must determine whether
> "the error had a substantial and injurious effect on [the] sentence." Under that standard,
> we must grant relief if we are in "grave doubt" as to whether a jury would have found the
> relevant aggravating factors beyond a reasonable doubt. Grave doubt exists when, "in the
> judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise
> as to the harmlessness of the error." [¶] Further, in conducting harmless error review of
> an *Apprendi* violation, we may consider evidence presented at sentencing proceedings.
> But "we do not consider new admissions made at sentencing in our harmless error
> inquiry."

12   *Butler*, 528 F.3d at 648 (citations omitted).  As stated in the Merits Review, *supra*, under California law,

13   "the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible

14   for the upper term [sentence]."  *Black II*, 41 Cal. 4th at 813; *see Butler*, 528 F.3d at 648 ("Under

15   California law, as we have explained, only one aggravating factor is necessary to set the upper term as

16   the maximum term.").  Thus, "[a]ny *Apprendi* error therefore will be harmless if it is not prejudicial as

17   to just one of the aggravating factors at issue."  *Butler*, 528 F.3d at 648.

18   During sentencing, the trial court noted three circumstances in aggravation: 1) "[Petitioner's]

19   prior convictions as an adult are numerous"; 2) "[Petitioner's] prior performance on misdemeanor and

20   felony probation was unsatisfactory in that he violated terms, failed to pay restitution, and re-offended";

21   and 3) "the victim became pregnant as a result of [Petitioner's] actions."  (9 RT 2062-63.)  The trial

22   court, concurring with the evaluation by the probation department, found no circumstances in mitigation.

23   (*Id.* 2062.)[11]

24

_____

25   [11]    Under California's Determinate Sentencing Law, "three terms of imprisonment are specified for most
     offenses." *People v. Sandoval*, 41 Cal. 4th 825, 836 (2007).  At the time Petitioner was sentenced, California Penal Code

26   section 1170(b) required the sentencing court to impose the middle term "unless there [were] circumstances in aggravation
     or mitigation of the crime." Cal. Penal Code § 1170(b) (1998).  Under California sentencing rules promulgated pursuant to

27   California Penal Code section 1170.3, selection of the upper term was justified "only if, after a consideration of all the
     relevant facts, the circumstances in aggravation outweigh[ed] the circumstances in mitigation."  Cal. R. Ct. 4.420(b) (2001).

28   At the time of Petitioner's sentencing, California Rule of Court 4.421 set forth a non-exhaustive list of circumstances in

1   The probation report supplied to and utilized by the trial judge indicates that Petitioner had the

2   following prior convictions as an adult: one or more counts of petty theft in 1990, burglary in 1991,

3   assault with a deadly weapon in 1994, resisting arrest in 1998, criminal battery in 2003, and vehicle code

4   violations in 1994, 1996, and 1998.  (*See* LD 10 at 2-4.)  The Court is confident and has no "grave

5   doubt" that a jury would have found, beyond a reasonable doubt, that Petitioner had "numerous" prior

6   adult convictions.

7   Accordingly, because any *Apprendi* error with regard to the numerous prior adult convictions

8   finding is harmless, and California law only requires one aggravating factor to impose the upper term,

9   the trial court's imposition of the upper term on Petitioner's convictions was not improper.  *See Butler*,

10  528 F.3d at 648.  Thus, habeas relief is not warranted on this claim.

11  **Claim Three**

12  In his third and final claim, Petitioner contends that to the extent Claims One and Two are

13  defaulted, he was denied ineffective assistance of trial and/or appellate counsel.  (Pet. 6.)  Petitioner first

14  raised this claim on habeas review before the California Supreme Court, which summarily denied this

15  claim.  (*See* LD 8.)  While a state court's summary denial is considered to be on the merits, *see Hunter*

16  *v. Aispuro*, 982 F.2d 344, 347-48 (9th Cir. 1992), here there is no "reasoned" state court decision, and

17  the Court accordingly conducts an "independent review of the record" with respect to this claim.  *See*

18  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).

19  Here, as discussed in Claim One, *infra*, Claim One is procedurally defaulted, and Petitioner has

20  failed to show cause for the default and prejudice or that a fundamental miscarriage of justice would

21  result.  Specifically, Petitioner has not shown that his trial counsel rendered ineffective assistance for

22  failing to object to the exclusion of evidence on constitutional grounds.  *See supra* Claim One,

23  Procedural Default.

24  Accordingly, the Court finds that the California Supreme Court's rejection of Petitioner's claim

25

26  aggravation, including that: the defendant's prior adult convictions were "numerous" and the defendant's prior performance
    on probation or parole was unsatisfactory. *See* Cal. R. Ct. 4.421(b)(2), (5).  In addition, at the time of Petitioner's sentencing,
27  California Rule of Court 4.408 stated "[t]he enumeration in these rules of some criteria for the making of discretionary
    sentencing decisions does not prohibit the application of additional criteria reasonably related to the decision being made.
28  Any such additional criteria must be shall on the record by the sentencing judge."  Cal. R. Ct. 4.408(a) (2001).

1   was neither contrary to, nor an unreasonable application of, clearly established federal law as determined

2   by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

3   **Certificate of Appealability**

4       An applicant seeking to appeal a district court's dismissal of a habeas petition under 28 U.S.C.

5   § 2254 must first obtain a certificate of appealability ("COA") from a district judge or circuit judge.  28

6   U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A judge should either grant the COA or state reasons

7   why it should not issue, and the COA request should be decided by a district court in the first instance.

8   Fed. R. App. P. 22(b)(1); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

9       The applicant for a COA must make a "substantial showing of the denial of a constitutional

10  right." 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529

11  U.S. 473, 483 (2000).  A "substantial showing" is defined as a demonstration (1) that the issues are

12  debatable among jurists of reason; (2) that a court could resolve the issues differently; or (3) that issues

13  are adequate to deserve encouragement to proceed further.  *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4

14  (1983); *see Slack*, 529 U.S. at 483-84 (stating that except for substituting the word "constitutional" for

15  the word "federal," § 2253 codified the pre-AEDPA standard announced in *Barefoot v. Estelle*).

16      Where, as present here, a district court has rejected constitutional claims on their merits, the COA

17  standard is straightforward.  "The petitioner must demonstrate that reasonable jurists would find the

18  district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484.  The

19  Court has reviewed the record of this case and finds that reasonable jurists would not find the Court's

20  assessment of the constitutional claims debatable or wrong.  On the merits of this case, reasonable jurists

21  would not debate the constitutionality of Petitioner's conviction and sentence.  Accordingly, the Court

22  declines to issue a certificate of appealability.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1

## **CONCLUSION AND ORDER**

2          For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with

3  prejudice and DECLINES the issuance of a certificate of appealability.   The Clerk of Court is

4  ORDERED to enter Judgment for Respondent and to close Case No. CV F 07-00621 LJO WMW HC.

5

6  IT IS SO ORDERED.

7  **Dated:   February 3, 2009          _____/s/ Lawrence J. O'Neill_____**
                                         UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28